(C. D. 817).

COLOR PHOTOGRAPH SUPPLY CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 1, 1943)

*Puckhafer, Rode & Rode* (*Howard C. Carter of counsel*) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon* and *Joseph A. Howard, Jr.*, special attorneys), for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges

LAWRENCE, Judge: In this case the collector of customs classified a so-called "emulsion coating machine with reeler for photo paper" under the provision in paragraph 353 of the Tariff Act of 1930 for

"articles having as an essential feature an electrical element or device," and assessed duty accordingly at the rate of 35 per centum ad valorem.

The only claim of the plaintiff is that the importation is properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said act as a machine or parts thereof not specially provided for.

Apparently it is not disputed that the article is in fact a machine in chief value of metal. However, if it has as an essential feature an electrical element or device within the meaning of said paragraph 353, it would clearly be more specifically provided for therein than under said paragraph 372, as claimed by the plaintiff.

The sole witness who appeared herein testified for the plaintiff that he was familiar with the importation in controversy and was in charge of the men who assembled and installed the machine and put it in running order.

Asked to give a general description of the machine he replied:

Essentially the machine, shall I say, took long strips of paper, dipped them in molten gelatin which carried the various pigments we used, passed the paper through chilling chambers and then hung them in festoons to dry.

When asked "* * * what electric parts were part of this importation?" the witness answered:

There were no electric parts that I know of. It was just barely framework. It was framework, tables, boxes, chilling boxes. There were no coils or condensers on it.

It further appears from the testimony of the witness that the machine "extended two floors in height," and measured 75 feet in length; that after importation it was installed with a switchboard having "stop" and "go" switches on both floors to control the blowers and the main motor drive; that a so-called relay "worked" one of the "stop" and "go" switches because it fed a 5-horsepower motor, and that there is not a switch that could really handle that capacity; that the switch goes to the relay which throws the power into the motor; and that that was part of the installation that "we" made. Other parts supplied from domestic equipment consisted of "the main drive, 5-horsepower motor and 2 motors attached to the blowing fans," these being 1-horsepower motors.

To quote further from the testimony of the witness:

* * *. There were the switches involved in starting and stopping the motors and the relays in starting and stopping the main motor, which was the 5-horsepower. We also installed a heating element, and a pump to circulate warm water around the trough which contained the gelatin. Also, there was a system for intercommunication between the two floors.

*        *        *        *        *        *        *

The main motor was connected to the machines through a Reeves drive, which is a variable drive governing the speed, to a belt.

To the question: "Were all the motors connected to the machine with the use of a belt and mechanism as you have described?" the witness replied: "The main drive was, yes, and the fans were also connected by belts."

While it appears from the foregoing that the mechanism was driven by electric power, the witness testified that "the machine came equipped with a large drive shaft and pulley," to which pulley "anything could be connected as long as it would revolve the shaft"; that no changes would have to be made in the machine itself to connect it to some source of power other than electricity, and that the cost of such substitution of power would be relatively inexpensive compared with the cost of the machine.

Furthermore, the witness testified that while the machine was equipped with a pumping arrangement for circulating the water, operated by a small motor which was part of the pumping device, nevertheless the machine was adapted for "any kind of pump on it— any power to the pump."

Although the machine when shipped to the United States was equipped with a thermostat and a mercury switch, they were, as testified by the witness, broken in transit, and inasmuch as it was impossible to have them replaced they were eliminated altogether, and the machine was operated by a thermometer in lieu of a thermostat, by means of which the operator watched the temperature. These facts were of course not known to the classifying officer at the time of importation.

With these essential facts before us, and upon the entire record, the question for determination by us is whether the importation is properly subject to classification under the third subdivision of said paragraph 353 as an article "having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs," and as such dutiable at the rate of 35 per centum ad valorem. If not so classifiable, the article is clearly subject to classification under paragraph 372 of said act as a machine or parts thereof not specially provided for, and as such dutiable at the rate of 27½ per centum ad valorem.

An examination of some of the leading authorities upon this subject satisfies us, after reviewing the evidence herein, that the classification of this importation under paragraph 353, *supra*, cannot be sustained.

In our opinion, this case is controlled by the principles enunciated by our appellate court in *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050, and *Ralph C. Coxhead Corp.* v. *United States*, 22 C. C. P. A. (Customs) 96, T. D. 47080.

In those cases the court laid down the rule that if an imported article is designed and constructed to use, and does use, electrical power

solely and not interchangeably for its intended purpose, that article together with its parts must be deemed to be covered by the provision for articles having as an essential feature an electrical element or device within the intendment of said paragraph 353.

The merchandise before the court in the *Dryden* case, *supra*, was a machine about 6 feet wide and about 10 feet long, having a platform which carried rubber cake under a cutting device which sliced the cake. Two electric motors accompanied the machine, one of which furnished the motive power for the machine, while the other supplied motive power to operate two small emery wheels which were in constant contact with the blade of the cutting device to keep it sharp.

The court found it unnecessary to decide whether the presence of the small motor would constitute the article an electrical machine within the statute, in view of the conclusion it reached as to the large motor. The latter, the court found from the record, was the proper size to drive the machine, and, what is more important here, made a further finding that "no other method of applying power is provided or arranged for." Furthermore, the court said that "no other power can be applied without a reconstruction of the machine, in part," adding that "the testimony shows that hand power could be applied by removing the motor and installing a pulley with a handle." In the instant case, however, steam or other power could be substituted for electrical energy by a relatively simple process, as will appear *infra*.

The court was of the opinion, therefore, that the article was essentially an electrical machine, and consequently clearly within the scope of the third subdivision of paragraph 353, *supra*.

Here, the converse is true. While the importation before us was designed and equipped with a thermostat and relay switches, that equipment was destroyed in transportation, and all efforts to obtain replacement parts failed. As a result, as stated by the witness, "we operated it our own way, which was more manual than automatic." Although a pump was installed to circulate water back and forth to a chamber in the machine, a thermometer was used in order to watch the temperature of the water. And while the pump was operated by electricity, it appears from the record that other energy could have been used. As expressed by the witness "we could have done better with the gas heater." Therefore, whatever electrical parts may have been shipped with the machine, none of them was used by the importer.

When the machine was set up in this country it extended two floors in height and was equipped with three "stop" and "go" switches on both floors which controlled the fan blowers and the main motor drive. The switches were used in starting and stopping the motors, and were connected with the machine through a so-called Reeves drive, which the witness described as "two pulleys with a very wide

V belt between them. They work on the principle of widening the distance between the two faces of each pulley, or narrowing it."

The testimony of the witness is uncontradicted that the machine could be driven by a source of power other than electricity, explaining that the machine came equipped with a large drive shaft and pulley to which "anything could be connected as long as it would revolve the shaft"; that no changes would have to be made in the machine to connect it with some other source of power, and that such substitution of power would involve a relatively small expense. In other words, the machine as imported could readily have been installed for operation by a motive power other than electricity.

Whether or not electrical parts were imported with the machine, or were installed after it was set up in this country, the testimony is undisputed that there was no electrical equipment when the machine was in operation which could not readily be substituted by other motive power, such as steam, gas, etc. Consequently, it may not fairly be said that the importation is a mechanism designed and constructed to use, and which does use, electrical power solely, and without which it could not function normally for the purposes intended. Hence, the imported article is not essentially an electrical machine under the doctrine of the *Dryden* case, and accordingly is not an article having as an essential feature an electrical element or device.

The *Dryden* case was cited with approval in the *Coxhead* case, *supra*, wherein certain calculating machines, which were operated by an electric motor compactly fitted in the bottom of the machines, were under consideration. In an elaborate and well-considered opinion in the *Coxhead* case, in arriving at the meaning of the phrase "having as an essential feature" in paragraph 353, the court said:

\* \* \*. We think Congress, by that term, meant that the motor or the electrical feature of the article must be essential to the operation of the article and that if the article was so designed and constructed that it could normally operate in two ways, both by electrical power and by hand power, interchangeably, it would not be an electrical article and the electrical element or device would not be an *essential element or device*. [Italics quoted.]

Further the court said:

\* \* \*. The motor would not be an essential element of a calculating machine if the machine as imported was so designed and constructed that it might, without substantial modification, be interchangeably operated by hand or by electrical power.

The appellate court did not definitely decide whether the calculating machines in the *Coxhead* case were or were not electrical machines having as an essential feature an electrical element or device, in view of the state of the record, but, owing to the importance of the issue, deemed it advisable to remand the case for a new trial. Nevertheless,

it did adhere to the guiding principles declared in the *Dryden* case, which was decided concurrently with the *Coxhead* case. As a matter of fact both of those cases have been cited with approval in several later cases. See *John A. Steer & Co.* v. *United States*, 24 C. C. P. A. (Customs) 293, 300, T. D. 48737; *Julius Forstmann & Co.* v. *United States*, 28 C. C. P. A. (Customs) 222, 226, C. A. D. 149; and *United States* v. *Mill & Mine Supply Co.*, 30 C. C. P. A. (Customs), 128, 130, 131, C. A. D. 224.

We find, therefore, from the uncontradicted evidence in this case that the importation is not essentially an electrical machine within the concept of the cases above cited, and therefore is not an article having as an essential feature an electrical element or device, as contemplated by paragraph 353, *supra*. Accordingly, it follows that the claim of the plaintiff that the imported article is dutiable at the rate of 27½ per centum ad valorem under paragraph 372, *supra*, as a machine or parts thereof not specially provided for, must be and hereby is sustained, and the decision of the collector of customs is reversed.

Judgment will be rendered accordingly.